# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

AHMAD FARID KHORRAMI,

    Plaintiff,

    v.

MICHAEL E. ROLINCE, *et al.*,

    Defendants.

No. 03 CV 6579
Judge James B. Zagel

**UNDER SEAL**

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Ahmad Farid Khorrami ("Plaintiff" or "Dr. Khorrami") filed a second amended complaint that states two counts against various Federal Bureau of Investigation ("FBI") and Immigration and Naturalization Service ("INS") agents (collectively "Defendants"). Count I is a *Bivens* claim alleging Fourth Amendment violations; Count II is a *Bivens* claim alleging Fifth Amendment violations. Currently before me is Defendants' motion to dismiss. For the following reasons, Defendants' motion is granted in part and denied in part.

## I. BACKGROUND

### A. Facts

Dr. Khorrami is an Iranian-born British citizen currently residing in the United States. Dr. Khorrami spent some time in the U.S. in the mid-1970s and then returned here in 1997.

In August 2000, Dr. Khorrami applied for legal permanent residence based upon his marriage to a U.S. citizen. In February, 2001, he was issued a form I-512 advance parole authorization that enabled him to visit Canada and be paroled back in the country. In July, 2001, Dr. Khorrami became employed at Skyway Airlines, a commuter airline based in Milwaukee, Wisconsin.

In the days following September 11, 2001, Dr. Khorrami learned that FBI agents had contacted many of his acquaintances to inquire about him. Upon becoming aware of this, he reached out voluntarily to the Chicago FBI office and offered to make himself available for a meeting. On September 17, 2001, two Chicago FBI agents visited Dr. Khorrami at his home in Chicago for approximately three hours. After the meeting, the agents left and indicated that they did not have ongoing concerns about him.

Later that day (September 17, 2001), Dr. Khorrami went to Skyway's offices to meet with the chief pilot. During that meeting, Plaintiff alleges that an FAA representative abruptly entered the office and ripped Dr. Khorrami's airport security ID from around his neck. At that point, several government agents—from the INS and FBI—appeared at Skyway's offices. Dr. Khorrami alleges that the agents—including Agent John Neinhardt of the Milwaukee INS—then interrogated him for the next twelve hours. He claims that the agents used threatening and abusive language. Dr. Khorrami also claims that throughout the interrogation, he pleaded with Agent Neinhardt to allow him to call the British embassy; he claims that he was not permitted to do so.

Dr. Khorrami alleges that he was then taken to the FBI headquarters in Milwaukee where he submitted to a lie detector test. He claims that an FBI agent there—Dale Mueller—falsely told him that he worked for a private company that administered the test. He further asserts that he was asked to sign a document consenting to the use of the test results in court, and told, "if you don't sign, you don't get out of here." Plaintiff also alleges that Agent Neinhardt warned him, "we're going to cancel your visa, we're going to take you."

Agent Neinhardt then allegedly handed Plaintiff a Notice to Appear, charging that he was an arriving alien in INS custody. He also claims that he was served with a letter from the then-INS Director stating that his immigration "parole" had been revoked. Dr. Khorrami claims that he was then taken to a waiting car, that Agent Neinhardt punched him in his right arm, and that Agent Neinhardt called him a terrorist. Plaintiff claims that he was then transported to Waukesha County Jail in Wisconsin and that he was strip searched upon arrival.

He alleges that on September 19, 2001, Agent Neinhardt again interrogated him and told him that he had canceled Plaintiff's visa in order to assist his colleagues at the FBI. Dr. Khorrami claims that Agent Neinhardt told him that the INS was involved because the FBI lacked sufficient information to continue to keep him.

Dr. Khorrami asserts that his wife spoke with FBI and INS officials on September 18, 2001, and that they indicated to her that it was likely that Plaintiff would soon be cleared from the suspect list. He also claims that an agent informed his wife on September 22, 2001, that the FBI had cleared Dr. Khorrami's name from all watch lists. Dr. Khorrami maintains that despite these assurances, he remained in detention. He claims that on September 21, his fourth day in Waukesha, Agents Dale Mueller and Jack Felske of the Milwaukee FBI interrogated him again. He claims that while Agent Felske waited in the hall, Agent Mueller threatened him verbally, knocked him out of his chair, and kicked him repeatedly. He alleges that this beating caused blood to appear in his urine, and that he was treated for suicidal tendencies. He further asserts that he began experiencing chest pains.

3

On September 24, he was taken to an INS processing center in Broadview, Illinois and then quickly moved to the DuPage County Jail in Wheaton, Illinois. In September and October, 2001, Plaintiff's counsel filed motions to have Dr. Khorrami released on bail. The INS opposed the motions, arguing that Plaintiff was an inadmissible alien and that the Immigration Judge ("IJ") had no jurisdiction to reconsider an INS bail determination. On October 10, 2001, the IJ denied Dr. Khorrami's bond application.

On November 13, 2001, while Dr. Khorrami's bond application was renewed and pending, defendant Michael Rolince, FBI Chief of the International Terrorism Operations Section, sent the Chicago INS District Office a sworn declaration entitled "In Bond Proceedings: RE: AHMAD FARID KHORRAMI (A#77928803)." The affidavit, drafted on November 9, stated the following concerns about Khorrami: (1) Khorrami was born in Iran and had a commercial pilot's license; (2) he had been a flight instructor at two flights schools that had trained terrorist hijackers; (3) he was suspected of having lived in an apartment building which was also once the address of a suspected terrorist; (4) he was working at a low-level job in the airline industry despite his advanced degrees in aeronautical engineering and mathematics; (5) his polygraph results had been inconclusive; (6) he had over $100,000 in the bank; and (7) he had asked bank employees whether money in a substantial cash account could be traced to him.

According to Plaintiff, this declaration was intended to serve two purposes consistent with the FBI and INS post-9/11 policy in place at the time. Pursuant to this policy, the FBI and INS used federal immigration laws to detain aliens suspected of terrorist ties. *See* OFFICE OF THE INSPECTOR GENERAL, THE SEPTEMBER 11 DETAINEES: A REVIEW OF THE TREATMENT OF ALIENS HELD ON IMMIGRATION CHARGES IN CONNECTION WITH THE INVESTIGATION OF THE SEPTEMBER

11 ATTACKS 1 (2003). Many aliens arrested were labeled as "of interest" to federal law

enforcement agents, and they remained on "the INS Custody List" until formally cleared by the

FBI. *Id.* at 14. Once a detainee was labeled "of interest," the Department of Justice "severely

limited [the detainee's] ability to obtain bond[.]" *Id.* The INS required District Directors to make

initial custody determinations of "no bond" for all September 11 detainees. *Id.* at 76. Were an

"of interest" detainee to request a bond re-determination hearing, INS officials were required to

oppose release and defend the "no bond" position until the FBI declared the detainee no longer of

interest. *Id.* at 83.

By sending the declaration to the INS District Director, FBI Chief Rolince made it clear

that Dr. Khorrami was still considered to be "of interest" to the FBI, which required INS

attorneys to oppose bond before the Immigration Court. The declaration was also sent for use as

evidence in the Immigration Court, and submitted to the IJ at a November 14, 2001 hearing.[1]

The numerous concerns cited in the affidavit served as justification for the FBI's investigation of

Plaintiff to determine his connections, if any, to the terrorist attacks of September 11, 2001.

One month later in a December 12, 2001 hearing, the INS submitted a letter from

defendant Thomas Knier, FBI Special Agent in Charge, explaining that one of the statements in

Rolince's letter—that Dr. Khorrami lived in the same apartment as one of the hijackers—was

inaccurate. Knier explained that the FBI had information as early as September 18, showing that

this statement was incorrect at the time the affidavit was submitted. He further explained that it

_____

[1] The hearing held on that day appears to have involved a renewal of Plaintiff's bond
application. I have found no record of any order or ruling entered in reference to the November
14 hearing, only papers filed in advance of the hearing with regard to Plaintiff's motion to
terminate proceedings.

was nevertheless mistakenly included because of the fast-paced need to gather millions of pieces of information regarding the September 11 bombings and because the FBI was unable to centralize this information.

On December 14, 2001—two days after defendant Knier's clarifying letter was submitted—the INS granted Dr. Khorrami parole under 8 U.S.C. § 1226, releasing him from detention pending his removal proceedings.

In February, 2002, Dr. Khorrami suffered a heart attack, which he claims resulted from his mistreatment and incarceration.

During the course of Dr. Khorrami's removal proceedings, his counsel filed several motions and appeared at several hearings in which he argued that Dr. Khorrami was not subject to detention or removal because he was not an inadmissible alien as charged by the INS. The IJ denied these motions, and in 2004, issued a final order, finding Dr. Khorrami to be removable as charged. In particular, he held that once Dr. Khorrami's parole was revoked, his status reverted to an alien seeking admission into the United States, and because he had no valid entry documents, he was removable under 8 U.S.C. § 1182(a)(7)(A)(i)(I). Although the IJ found that Dr. Khorrami was removable, he also granted Plaintiff's request for permanent residence status based on his marriage to a U.S. citizen. As a result, Dr. Khorrami was not deported.

**B. Procedural History**

In December 2003, Dr. Khorrami filed his First Amended Complaint against FBI and INS agents alleging Fourth Amendment and Fifth Amendment violations that occurred during his interrogation and subsequent detention. In essence, Plaintiff claimed that he was unlawfully seized and detained, his substantive due process rights were violated when he was assaulted by

federal agents, and his procedural due process rights were violated by Defendant Rolince who, Dr. Khorrami claims, submitted a false affidavit during an immigration hearing. In November 2006, Defendants filed a motion to dismiss the complaint in its entirety, arguing that (1) the Immigration and Nationality Act ("INA") stripped federal district courts of jurisdiction over the government's discretionary decisions regarding alien removal proceedings; (2) qualified immunity barred Plaintiff's claims; and (3) the Court lacked personal jurisdiction over nine of the defendants. This Court held that 8 U.S.C. § 1252(g) stripped it of jurisdiction to hear the portion of Plaintiff's Fourth Amendment claim based on his arrest and detention, but that the remaining claims, including the pre-arrest Fourth Amendment claim, were not barred. This Court did, however, hold that it could not exercise personal jurisdiction over the Milwaukee-based defendants implicated in Plaintiff's pre-arrest Fourth Amendment and substantive due process claims, and these portions of the complaint were dismissed without prejudice. The procedural due process claim against Rolince was found to be sufficient, and the Court held that despite his status as an alien, Defendant was entitled to some due process rights, and that it was premature to address the issue of qualified immunity.

In July 2007, Defendants appealed this Court's order "denying" qualified immunity. The Seventh Circuit dismissed the appeal for want of jurisdiction, explaining that a district court's decision to delay adjudication of the qualified immunity defense (rather than an outright rejection of it) is not a final judgment subject to appeal. *Khorrami v. Rolince*, 539 F.3d 782 (7th Cir. 2008).

While the appeal was pending, Plaintiff filed a complaint in the Eastern District of Wisconsin consisting of similar allegations against the Milwaukee-based defendants dismissed

7

by this Court for lack of personal jurisdiction. On August 29, 2008, Judge Rudolph Randa dismissed all claims except for the substantive due process claim against Agent Mueller. Judge Randa agreed with this Court that Section 1252(g) does not divest district courts of subject matter jurisdiction over the Fifth Amendment and pre-arrest Fourth Amendment claims, but dismissed the pre-arrest Fourth Amendment claim on qualified immunity grounds and the Fifth Amendment claim because the agents' actions and the lengths of interrogation and detention did not "shock the conscience," and because Plaintiff, an excludable alien on advanced parole, failed to allege the violation of a clearly established constitutional right.

On September 8, 2009, Plaintiff filed a Second Amended Complaint in this case, attempting to allege facts that warrant this Court's exercise of jurisdiction over the Milwaukee-based defendants. Plaintiff also made some modifications to his procedural due process claims against Rolince. Notably, Plaintiff alleges that after the September 11 attacks, the FBI and INS developed a policy under which aliens identified as "of interest" were arrested and detained by the INS while the FBI investigated their involvement in terrorist activity.[2] No September 11 detainee would be released by the INS until "cleared" by the FBI of any connection to terrorist activity. According to Plaintiff, Defendant Rolince, pursuant to this policy, submitted a false affidavit to the INS District Director and the Immigration Court to be used as evidence at a hearing conducted during the pendency of Plaintiff's bond application.

---

[2] In support of these allegations, Plaintiff cites the aforementioned report issued by the Office of the Inspector General entitled THE SEPTEMBER 11 DETAINEES: A REVIEW OF THE TREATMENT OF ALIENS HELD ON IMMIGRATION CHARGES IN CONNECTION WITH THE INVESTIGATION OF THE SEPTEMBER 11 ATTACKS (2003).

Defendants now move to dismiss this complaint, arguing that: (1) Plaintiff's procedural due process claim against Rolince is barred by qualified immunity; (2) Plaintiff's claim against Rolince is barred by absolute witness immunity; and (3) the previously dismissed Fourth and Fifth Amendment claims against the Milwaukee-based Defendants should be dismissed for the same reasons articulated by Judge Randa in the Wisconsin case, pursuant to the "law of the case" doctrine.

## II. STANDARD OF REVIEW

A Motion to Dismiss under Rule 12(b)(6) requires that I analyze the legal sufficiency of the complaint, and not the factual merits of the case. *Autry v. Northwest Premium Servs., Inc.*, 144 F.3d 1037, 1039 (7th Cir.1998). I must take all facts alleged in Plaintiff's complaint as true and draw all reasonable inferences from those facts in favor of Plaintiff. *Caldwell v. City of Elwood*, 959 F.2d 670, 671 (7th Cir.1992). Plaintiff, for his part, must do more than solely recite the elements for a violation; he must plead with sufficient particularity so that their right to relief is more than a mere conjecture. *Bell Atl., Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Plaintiff must plead his facts so that, when accepted as true, they show the plausibility of his claim for relief. *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009). Plaintiff must do more than plead facts that are "consistent with Defendants' liability" because that only shows the possibility, not the plausibility, of their entitlement to relief. *Id.* (internal quotations omitted).

## III. DISCUSSION

### A. Procedural Due Process Claim

### 1. Qualified Immunity

Defendants maintain that Plaintiff's procedural due process claim is barred by qualified immunity. First, Defendants argue that Plaintiff failed to plead Rolince's knowing submission of a false affidavit. *Daniels v. Williams*, 474 U.S. 327, 328 (1986) (holding that "the Due Process Clause is simply not implicated by a *negligent* act of an official causing unintended loss of or injury to life, liberty, or property.") (emphasis in original); *Steidl v. Fermon*, 494 F.3d 623, 631 (7th Cir. 2007) (defendant must "act either knowingly or with deliberate, reckless indifference.") (citation and quotations omitted). But this argument ignores the plain language of the complaint which states that Rolince knew or could have ascertained that certain assertions contained in the declaration were false. The Knier letter explained that the FBI had information showing that this statement was incorrect at the time the affidavit was submitted, and this supports Plaintiff's allegation.

Second, Defendants argue that Plaintiff failed to plead any prejudice resulting from the submission of the Rolince affidavit. "To prevail on a due process claim an applicant must show prejudice." *Capric v. Ashcroft*, 355 F.3d 1075, 1087 (7th Cir. 2004). Prejudice exists where the alleged transgression "is likely to impact the results of the proceeding." *Id.* at 1087-88 (citations omitted). According to Defendants, it was the INS District Director and not the IJ that denied Dr. Khorrami's bond request,[3] and therefore the declaration had no impact on the immigration proceeding. Furthermore, Defendants note that nowhere in the complaint does Plaintiff allege

---

[3] Defendants maintain that Plaintiff conceded this point on appeal.

that the IJ or District Director relied on the false statements in the affidavit to deny bond. But Plaintiff does allege that the Rolince declaration served two purposes: (1) to notify the INS District Director that Dr. Khorrami was still considered a "person of interest," and that pursuant to the post-9/11 policy in place, the District Director should refrain from granting parole and direct the INS attorneys to oppose bond in the immigration court; and (2) to be used as evidence at the November 14, 2001 immigration court hearing. The parties do not dispute that the application for bond was denied subsequent to the submission of the declaration.

On a motion to dismiss, I must take all facts alleged in Plaintiffs' complaint as true and draw all reasonable inferences from those facts in favor of Plaintiffs. *Caldwell*, 959 F.2d at 671. The facts as they are alleged support an inference that the submission of the false declaration was likely to impact the result of the proceeding. The notification to the INS that Dr. Khorrami was still a person of interest led the District Director to keep Dr. Khorrami in detention and to oppose the grant of bond by the IJ. This is a plausible inference in light of the post-9/11 policy that was in place at the time. Furthermore, although Defendants maintain that the IJ could not exercise jurisdiction over the issue of Dr. Khorrami's detention, Rolince did prepare and submit an affidavit as evidence to justify detention. It is reasonable to infer that the IJ was in a position to decide the issue, and that the affidavit was persuasive.

Third, Defendants argue that as an inadmissible alien, Plaintiff was not entitled to due process protections during the bond determination, as he had no constitutionally protected liberty interest to be free from detention pending removal proceedings. Defendants made this same argument in support of their previous motion to dismiss, and this Court rejected it, explaining:

> At bottom, Defendants seem to be arguing that since Khorrami did not have a general right to be free from detention, the Government could lawfully go to any and all lengths to keep him locked up. These arguments contradict basic notions

11

of fairness and, if pushed to their limits, would turn immigration proceedings into mere kangaroo courts. I have no doubt the Government has no intention to do so, but that does not make the assertion of the power to do so any more palatable. Regardless of the precise contours of an alien's procedural due process rights, some rights do exist. *See Reno v. Flores*, 507 U.S. 292, 306 (1993) ("It is well established that the Fifth Amendment entitles aliens to due process of law in deportation proceedings."). Those rights are sufficient to overcome Defendant's motion to dismiss at this state of the litigation.

*Khorrami v. Rolince*, 493 F. Supp. 2d 1061, 1072-73 (N.D.Ill., 2007).

Plaintiff's Second Amended Complaint clarifies the allegedly violated right -- Plaintiff's right to a decision free from the influence a false affidavit. Defendants note that the Supreme Court has long recognized a distinction between an alien who has illegally passed through the gate of entry and an alien on its threshold, and the rights to which each is entitled. While an alien unlawfully in this country is considered a "person" for purposes of constitutional due process, an alien stopped at the border, who has not yet gained entry, is entitled to only those procedures authorized by Congress. The IJ found that once Dr. Khorrami's parole was terminated, his status became that of "an alien seeking admission into the United States." Because his visa expired in June 2000, and he filed his application for adjustment of status in August 2000, he had no legal means to reenter the country after his trip abroad (hence the application for advance parole). Parole of an inadmissible alien "shall not be regarded as an admission of the alien[,]" and when the parole is terminated, "his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States." 8 U.S.C. § 1182(d)(5)(A). At the time of the parole termination, Dr. Khorrami was physically present in the United States but technically considered to be detained "at the border" without having gained entry. This is commonly referred to as the "entry fiction" doctrine. *American-Arab Anti-Discrimination Committee v. Ashcroft*, 272 F. Supp. 2d 650, 665 (E.D. Mich. 2003). According to Defendants,

because Dr. Khorrami had technically not "entered" the country, he is only entitled to those

procedural rights conferred by Congress, which in this context, amount to none.[4]

There is some support for the idea that aliens such as Dr. Khorrami, who were granted

advance parole during the pendency of an adjustment of status application, are entitled to greater

protections than those who are simply paroled in or stopped at the border, even if parole is

terminated or revoked.[5] Furthermore, the parties do not dispute that United States immigration

regulations allow an alien with an expired visa who has applied for permanent residence status to

remain in the country pending the disposition of the application. *Yesil v. Reno*, 958 F. Supp. 828,

---

[4] The application of the entry fiction doctrine to plaintiffs like Dr. Khorrami appears
problematic in light of the fact that "inadmissible aliens" are entitled to less process than illegal
aliens. To provide more rights to an illegal alien than to an "inadmissible alien" with a pending
adjustment of status application who was paroled into the country pursuant to a grant of advance
parole provides a perverse incentive - namely, a motive to overstay one's visa without pursuing
any legal avenues to remain in the country, or to leave and reenter illegally rather than seek
advance parole. While one who is granted an adjustment of status and is permitted to remain in
the country legally is better off in the end, he is provided less protection than an illegal over-stay
from the time his visa expires to the time his pending application is approved.

[5] This distinction can be found in the Code of Federal Regulations. Under 8 C.F.R.
§ 1.1(q), if paroled into the country an "arriving alien" keeps his status as such, regardless of
whether his parole is terminated, subjecting him to expedited removal under 235(b)(1)(A)(i) of
the INA (8 U.S.C. § 1225(b)(1)(A)(i)). In contrast, an arriving alien paroled "pursuant to a grant
of advance parole which the alien applied for and obtained in the United States prior to the alien's
departure from and return to the United States, will not be treated, solely by reason of that grant
of parole, as an arriving alien under section 235(b)(1)(A)(i) of the Act." In other words, an alien
who obtains advanced parole in the United States prior to his departure may not be subject to
expedited removal and is instead subject to the conventional removal process under which the
alien is afforded a greater amount of legal safeguards. 8 U.S.C. § 1229a, 8 U.S.C. § 1225(b)(2);
*American-Arab Anti-Discrimination Committee*, 272 F. Supp. 2d at 653.
 Pursuant to 8 C.F.R. §208.14(c)(4)(1), an asylum-seeking alien with advanced
authorization for parole but whose parole has been terminated must be referred to an IJ for
adjudication in removal proceedings once his asylum application is granted. In contrast, ection
208.14(c)(4)(2) dictates that an asylum-seeking alien without advanced authorization for parole is
subject to expedited removal.

843 (S.D.N.Y. 1997). Such aliens are not "unlawfully" in the United States and are allowed to

seek employment authorization. *United States v. Hernandez*, 913 F.2d 1506, 1513 (10th

Cir.1990); 8 C.F.R. 247a.12(c)(9) (1997). The Supreme Court has noted that:

> Mere lawful presence in the country creates an implied assurance of safe conduct
> and gives him certain rights; they become more extensive and secure when he
> makes preliminary declaration of intention to become a citizen, and they expand
> to those of full citizenship upon naturalization.

*Kwong Hai Chew v. Colding*, 344 U.S. 590, 598 n.5 (1953) (quoting *Johnson v. Eisentrager*, 339

U.S. 763, 770-771 (1950)). Although these cases address the rights of resident aliens, the

principle is not irrelevant here. Dr. Khorrami was lawfully admitted into the United States, and

was lawfully living here while his application for permanent resident status was pending. He was

authorized to work, applied for a change in status, and developed ties that go with residence.

Defendants rely on *Ibragimov v. Gonzales*, 476 F.3d 125 (2nd Cir. 2007), for the

proposition that Dr. Khorrami is entitled to no more procedural due process rights than an

inadmissible alien literally stopped at the border. In that case, the plaintiff alien overstayed his

visa, applied for an adjustment of status based on marriage, obtained advance parole, briefly left

the country, and was paroled upon return. Nearly two years after his application for adjustment

of status was denied, the INS revoked his parole and two months later, he was served a notice to

appear for removal proceedings before an IJ.[6] In discussing the IJ's conclusion that the plaintiff

was an "arriving alien" and not a "visa overstay," the Court noted that upon his parole back into

the country, "he was entitled only to the rights of an advance parolee (namely, the right to

physically enter the country and complete his adjustment-of-status application as an "arriving

alien") and was not entitled to the enhanced protections that would have been available to a visa

---

[6] Notably, the plaintiff Ibragimov was not subject to expedited removal.

overstay who never left the country." *Id.* at 133.[7] The Court, however, did not specify what those enhanced protections are, nor did it delineate the contours of any basic protection afforded arriving aliens.

Regardless of the scope of basic protections afforded plaintiffs such as Dr. Khorrami, it is difficult to see how Plaintiff's right to a bond decision free from the influence of a false declaration deliberately submitted by a law enforcement official would not be one of them. Defendants maintain that because Plaintiff had no right to a hearing and because the decision to release Plaintiff was a discretionary one by the INS District Director, Plaintiff has failed to demonstrate the requisite constitutional deprivation of a protected interest required for a successful due process claim. They are correct that inadmissible aliens have no right to a detention hearing before an IJ and that the Attorney General's discretionary judgment to deny bond is not reviewable. But Dr. Khorrami is not claiming a protected interest in the availability of such a hearing, or a right to remain free pending removal proceedings. He is instead arguing that he was entitled to a "fair" proceeding, untainted by the false affidavit.

Inadmissible aliens are entitled to some substantive and procedural due process rights. *See Matter of Exilus*, 18 I. & N. Dec. 276, 281, 1992 WL 190690 at *281 (BIA 1982) (citing *Ramirez v. INS*, 550 F.2d 560 (9th Cir.1977); *Tejeda-Mata v. INS*, 626 F.2d 721 (9th Cir.1980)) ("Exclusion and deportation proceedings are civil, rather than criminal, in nature, and the constitutional requirements of due process are satisfied by a full and fair hearing."). However,

---

[7] Plaintiff distinguishes *Ibragimov* from this case on the ground that Ibragimov's application for adjustment was denied whereas Dr. Khorrami's was still pending. However, this argument is unavailing, since it goes to whether he is an "inadmissible alien," as determined by the IJ - a determination that cannot be reviewed by this court. But *Ibragimov* does demonstrate that aliens whose advance parole is revoked are still entitled to more process than those entering for the first time, even if they are not entitled to the full panoply afforded to resident aliens.

15

neither side clearly explains the nature of the November 2001 hearing, making it difficult to ascertain the extent of the IJ's authority to release Dr. Khorrami and the rights due him at the hearing. We know that in October 2001, the immigration court denied Plaintiff's motion for bond redetermination, presumably because it lacked the authority to reconsider the INS's initial determination on the matter.[8] Plaintiff claims that the November hearing that followed was "the first on-the-record event with someone empowered to release Khorrami[.]" Although Plaintiff does not cite any statutory or regulatory authority in support of this claim, and it appears that he had no "right" to such a hearing, the policy that was in place at the time suggests that the IJ did have the authority to release Dr. Khorrami. Moreover, Defendants' submission of the affidavit to the IJ suggests an effort to persuade the IJ that Dr. Khorrami's continued detention was justified - an argument on the merits, and it is clear that Defendants were not relying solely upon a "lack of jurisdiction" argument.

Even if Congress did not confer upon Plaintiff a right to a bond hearing, the fact remains that such a hearing occurred, and that Rolince submitted a false affidavit to be used as evidence before the IJ. The affidavit was the alleged basis for the INS' opposition to bond at the November hearing, and we can infer, from the submission of the affidavit to the IJ, that the IJ had some authority to release Dr. Khorrami. These allegations demonstrate that Dr. Khorrami may have been deprived of a constitutional right - the right to a fair hearing. *See American-Arab Anti-Discrimination Comm.*, 272 F. Supp. 2d 650, 669 (E.D. Mich. 2003) ("[E]ven though petitioners were excludable aliens, as that term was formerly used, . . . they are still entitled to some level of due process. This level of due process requires at the least . . . that the procedures utilized against

---

[8] I say "presumably" because there is no written opinion from the IJ, only a denial order dated October 10, 2001.

them are lawfully applied."). As noted in my previous opinion, without such a right, immigration proceedings are transformed into kangaroo courts. *Khorrami*, 493 F. Supp. 2d at 1072-73.

Plaintiff also maintains that the submission of the affidavit to the INS District Director violated his due process rights. The parties submit several arguments as to whether the District Director's discretion to determine bond is limited by constitutional constraints or reasonableness, and whether Plaintiff had a constitutionally protected interest in the District Director's bond determination. But Plaintiff here is not attacking the decision itself. He seeks neither the reversal of the District Director's bond determination, nor of the IJ's determination of his status. He challenges only the single act of a government official that may very well have affected that decision. Furthermore, it is unclear at this point how the post-9/11 policy in place at the time affected the "discretionary" nature of the District Director's bond decision. The policy suggests that the initial determination and defense of the "no bond" position were not exercises of discretion but rather the result of a directive that hinged on the FBI's classification of Dr. Khorrami as a person of interest. It is conceivable that further development will uncover who could have released Dr. Khorrami and what actually transpired at the November 2001 hearing. But Dr. Khorrami's allegations make clear that two of the possible decision makers were both influenced by the false allegations contained in Rolince's declaration.

At this stage, a determination that qualified immunity bars Plaintiff's claim is premature. Defendants maintain that no reasonable official would have reason to believe that Rolince's conduct violated clearly established constitutional rights in light of his status as an inadmissible alien. However, despite Dr. Khorrami's status, I find it hard to believe at this stage that a reasonable official could find it "lawful" to submit a false affidavit to an IJ during a bond hearing. "For a constitutional right to be clearly established, its contours must be sufficiently

17

clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (internal citations and quotations omitted). Rolince made his declaration under penalty of perjury. It was submitted to the IJ as well as the District Director allegedly as part of a directive to oppose Dr. Khorrami's bond. Until more facts emerge as to the nature and substance of the November 2001 hearing, the authority of the IJ to release Dr. Khorrami at that time, the role of the declaration at that hearing, and the nature of the District Director's decision to oppose bond in light of the post-9/11 policy, a finding of qualified immunity would be inappropriate.

## 2. Absolute Immunity

Defendants next maintain that absolute witness immunity bars Plaintiff's Fifth Amendment claim to the extent that Dr. Khorrami is alleging that the affidavit tainted the decision made by the IJ. Defendants cite *Briscoe v. LaHue*, 460 U.S. 325, 332 (1983) in support of the proposition that officials giving perjured testimony are immune from § 1983 liability pursuant to the doctrine of absolute witness immunity. On appeal, the Seventh Circuit touched on the absolute witness immunity defense, noting that "relevant questions would include whether Rolince made the statements Dr. Khorrami is attacking during the pre-judicial phase of these proceedings, *see Malley v. Briggs*, 475 U.S. 335 (1986); whether Rolince should be characterized as a 'witness'; and whether an immigration court is the kind of tribunal the rule contemplates." I find that absolute witness immunity is inapplicable in immigration bond proceedings such as the one conducted in November 2001, in light of the lack of procedural safeguards available at the hearing.

18

In *Butz v. Economou*, 438 U.S. 478, 512 (1978), the Court explained that "safeguards built into the judicial process tend to reduce the need for private damage actions as a means of controlling unconstitutional conduct." Specifically with regard to witnesses, the Court noted that they are subject to cross examination and to penalty of perjury. *Id.*

In *Cleavinger v. Saxner*, 474 U.S. 193, 201 (1985) the Court restated its "functional approach" to immunity law, which rests on "the nature of the responsibilities of the individual official." Referring to *Butz*, the Court considered the following non-exhaustive list of factors in determining whether absolute immunity applied:

> (a) the need to assure that the individual can perform his functions without harassment or intimidation; (b) the presence of safeguards that reduce the need for private damages actions as a means of controlling unconstitutional conduct; (c) insulation from political influence; (d) the importance of precedent; (e) the adversary nature of the process; and (f) the correctability of error on appeal.

*Id.* at 202. In denying absolute immunity to committee members of a prison's disciplinary board, the Court commented that at board hearings:

> The prisoner was to be afforded neither a lawyer nor an independent nonstaff representative. There was no right to compel the attendance of witnesses or to cross-examine. There was no right to discovery. There was no cognizable burden of proof. No verbatim transcript was afforded. Information presented often was hearsay or self-serving. The committee members were not truly independent. In sum, the members had no identification with the judicial process of the kind and depth that has occasioned absolute immunity.

*Id.* at 206.

In *Briscoe v. LaHue*, 460 U.S. at 340-41, the Court found that a police officer who gave perjured testimony at a criminal trial was absolutely immune from damages under § 1983. Defendants point to *Briscoe's* articulation of purpose for doctrine - to encourage witnesses to testify candidly and without fear of liability. *Id.* at 333. Certain "truth-finding safeguards of the judicial process," decrease the possibility of unjust convictions based on perjured testimony. *Id.*

19

at 344-45. In support of its holding the Court explained that "the truth-finding process is better served if the witness's testimony is submitted to the crucible of the judicial process so that the factfinder may consider it, after cross-examination, together with the other evidence in the case to determine where the truth lies." *Id.* at 333-34 (quotations and citation omitted).

According to Plaintiff, the bond proceeding at issue lacks several procedural safeguards that allow for absolute immunity. The bond hearing was held in secret; pursuant to the post-9/11 policy the INS attorneys were unable to exercise prosecutorial discretion; Dr. Khorrami had no right to compel or cross-examine witnesses or challenge the use of hearsay evidence; and there was no right to discovery.

The Sixth Circuit in *Detroit Free Press v. Ashcroft*, 303 F.3d 681, 703-5 (2002) noted the important functions of public access to hearings. Such access (1) "acts as a check on the actions of the Executive by assuring us that proceedings are conducted fairly and properly[;]" (2) "ensures that government does its job properly;"[9] (3) "provides catharsis to the community in the post-9/11 era;" and (4) "enhances the perception of integrity and fairness." In sum, public access to a hearing serves to ensure its fairness. In this case, there was no jury present and the INS was acting pursuant to the FBI's direction. Public access is even more important in such instances, and here this important safeguard was lacking.[10]

---

[9] The Court noted that these first two functions "are magnified by the fact that deportees have no right to an attorney at the government's expense. Effectively, the press and the public may be their only guardian." *Detroit Free Press*, 303 F.3d at 704.

[10] The Seventh Circuit has held that absolute immunity applies to a police officer giving perjured testimony in a closed grand jury proceeding. *Kincaid v. Eberle*, 712 F.2d 1023, 1023-24 (7th Cir. 1983). However, the presence of the jury itself provides a similar check to that provided by access. *Press-Enterprise Co. v. Superior Court of California*, 478 U.S. 1, 12-13 (1986) ("the absence of a jury, long recognized as an inestimable safeguard against the corrupt or overzealous prosecutor and against the compliant, biased, or eccentric judge, makes the

Moreover, although Rolince was subject to penalty of perjury, he was not subject to cross examination. The affidavit was drafted on November 9, and submitted at the November 14 hearing. Defendants do not dispute Plaintiff's assertion that they were not entitled to discovery, and it's clear from the record that even if they had had such an opportunity they would have little time to pursue it (assuming they were aware of the affidavit prior to the hearing). Not only was Rolince not subject to cross examination, but Plaintiff was not permitted to challenge the use of hearsay, nor was he entitled to compel witnesses or do discovery. Without such safeguards, I am unpersuaded that absolute witness immunity applies here.[11]

Even if absolute immunity does apply to the immigration bond proceeding, notwithstanding the post-9/11 policy in place at the time, it is not clear that Rolince would be

---

importance of public access to a preliminary hearing even more significant.") (citations and quotations omitted).

[11] In *Curtis v. Bembenek*, the Seventh Circuit held that a police officer who gave false testimony at a preliminary probable cause hearing was entitled to absolute immunity. 48 F.3d 281, 285 (7th Cir. 1995). In support of its holding, the Court noted the adversarial nature of the proceeding, the supervision of an impartial judge, and the fact that the witness testified under oath, subject to penalty of perjury and that he was subject to cross examination. *Id.* The Seventh Circuit in *Griffin v. Summerlin*, stated that under Indiana law "[t]he policy considerations underlying witness immunity for testimony in *open* court apply with equal force to other forms of testimony such as depositions and affidavits." 78 F.3d 1227, 1231 (7th Cir. 1995) (citing cases) (emphasis added). However, the facts in *Griffin* involved a witness testifying by deposition and the record indicates that he was cross examined during at least one deposition. *Griffin* did not involve testimony by affidavit and the Court did not address what safeguards, if any, are necessary to justify the application of the absolute immunity doctrine where a witness testifies by affidavit. Moreover, Rolince's affidavit was not submitted in open court, nor does it appear that Plaintiff had any opportunity to learn of the affidavit or its contents prior to the hearing. Without such knowledge, he would have been unable to gather any evidence to rebut the false statements made against him; neither does it appear that he had the right to present witnesses to refute the false statements. *See Burns v. County of King*, 883 F.2d 819, 823 (9th Cir. 1989) (defendant social worker charged with presenting false testimony by affidavit during post-trial detention hearing was entitled to absolute immunity where the hearing was adversarial in nature, subject to judicial supervision, and the plaintiff was entitled to present affidavits and witnesses to refute the allegedly false statements).

entitled to immunity. Absolute immunity does not apply to complaining witnesses. *Malley v. Briggs*, 475 U.S. 335, 340-341 (1986) (Police officer entitled only to qualified immunity while seeking an arrest warrant). Plaintiff maintains that Rolince functioned as a complaining witness in seeking to block Khorrami's release and detain him for investigative purposes. According to Plaintiff, the November 2001 hearing "was the first on-the-record event with someone empowered to release Khorrami" and was the first evaluation of whether Khorrami's investigative detention was justified. Plaintiff maintains that the submission of Rolince's affidavit was in effect the charging event.

It is true that "third parties who investigated and testified about what they found" are not considered to be complaining witnesses. *Latta v. Chapala*, 221 Fed. Appx. 443, 2007 WL 528822, at *1 (7th Cir. Feb. 12, 2007). Defendants maintain that Rolince's function is closer to this investigative function rather than one "who actively investigated or encouraged prosecution." In *Burns v. County of King*, the Court held that a social worker was entitled to absolute immunity against the charge that she submitted a false affidavit at a post-trial detention hearing. 883 F.2d at 823. Her function, the Court held, was not analogous to that of a complaining witness. But here, Plaintiff alleges that Rolince, attesting to fruits of the FBI's investigation, actively and successfully attempted to persuade the IJ to detain Khorrami prior to any adjudication on the merits - a function which in this situation is not so different from an attempt to procure an arrest warrant. Plaintiff maintains, and the post-9/11 policy in place at the time suggests, that the November 2001 hearing was the first evaluation by a neutral decision maker as to whether Dr. Khorrami's detention was justified - an evaluation akin to that which takes place to secure an arrest warrant. Without knowing more about the nature of the November 2001 hearing, especially in light of the policy in place at the time, it is difficult to ascertain what role Rolince's

affidavit actually played, and a finding of absolute immunity on the ground that Defendant's function was not equivalent to that of a complaining witness would be premature at this time.

## B. Jurisdiction

In his Second Amended Complaint, Plaintiff includes his previously dismissed claims: (1) pre-arrest Fourth and Fifth Amendment claims; (2) arrest and detention Fourth Amendment claims; and (3) substantive due process violations during detention. In my last opinion, I dismissed without prejudice the pre-arrest Fourth and Fifth Amendment claims and the remaining substantive due process claims for lack of jurisdiction. Plaintiff's Fourth Amendment claims based on the arrest and detention were barred by § 1252(g), which strips courts of jurisdiction to hear claims "arising from" the Attorney General's decision "to 'commence proceedings, adjudicate case, or execute removal orders.'" 8 U.S.C. 1252(g); *Reno v. American-Arab Anti-Discrimination Committee*, 525 U.S. 471, 483 (1999). I found Plaintiff's detention claim to be "a direct outgrow of the decision to commence proceedings[,]" thus "arising from" those proceedings such that the claims were barred. I expressed some doubt regarding whether this is the kind of claim Congress sought to bar, but that the plain language of the statute seemed to bar it, and besides, Dr. Khorrami could have raised these challenges in a habeas petition. The Wisconsin court adopted this Court's reasoning with regard to § 1252(g) as a jurisdictional bar, and dismissed the Defendants finding them entitled to qualified immunity.

Plaintiff now seeks review of this Court's dismissal of the Fourth Amendment arrest/detention claim, arguing that Dr. Khorrami's detention did not "flow directly" from the commencement of removal proceedings and that Dr. Khorrami was seized for investigation purposes. In its earlier opinion, this Court expressed some doubt as to Defendants' argument that an alien is automatically detained when removal proceedings are initiated against him thus

23

connecting the detention and proceeding. But Defendants now point to § 1225(b)(2)(A), which

dictates that "in the case of an alien who is an applicant for admission, if the examining

immigration officer determines that an alien seeking admission is not clearly and beyond a doubt

entitled to be admitted, the alien *shall* be detained for a proceeding under Section 1229a of this

title." (emphasis added). In this case, Dr. Khorrami's parole was revoked, making him an alien

seeking admission. At that point he had not lawfully entered the country, and, according to the

IJ, he failed to establish his admissibility. Upon revocation of his parole, he was served with a

notice to appear, thus initiating removal. He was arrested at that time. The arrest was a direct

outgrowth of the commencement of removal proceedings, or perhaps even mandatory pursuant to

8 U.S.C. § 1225(b)(2)(A). It is true that pursuant to § 1226(a) an alien "may be detained"

pending removal proceedings, and that Dr. Khorrami was eventually released pursuant to this

section, but the release was an exercise of discretionary parole by the Attorney General. To the

extent that Plaintiff alleges that this discretion should have been exercised sooner, such claim is

barred by § 1252(a)(2)(B)(ii). Although the FBI may have had an investigatory motive for

detaining Dr. Khorrami, the detention arises from the commencement of proceedings and was

mandated by statute.[12]

Plaintiff also seeks to relitigate the Fifth Amendment and pre-arrest Fourth Amendment

claims against the Milwaukee Defendants, which were previously dismissed for lack of personal

---

[12] Plaintiff relies heavily on *El Badwari v. Department of Homeland Security*, in which
the court found that where detention is not mandated in connection with removal proceedings,
"the decision to arrest and detain an alien is 'discrete' from the decision to commence removal
proceedings," thus finding the plaintiff's claim challenging his detention to be permissible. 579
F. Supp. 2d 249, 265-66 (D. Conn. 2008). But the court there notes that where detention is
mandated by statute, it "necessarily flow[s] from the government's decision to initiate removal
proceedings." *Id.* at 266.

jurisdiction. Defendants maintain that these claims should be barred under the "law-of-the-case doctrine," and that this court should adopt Judge Randa's decision in the Wisconsin case that Defendants are qualifiedly immune. However, this doctrine is inapplicable here. The law-of-the-case doctrine "posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages *in the same case*[.]" *E.E.O.C. v. Sears, Roebuck & Co.*, 417 F.3d 789, 796 (7th Cir. 2005) (emphasis in original). Plaintiff did not transfer his claims in this case to Wisconsin but rather filed a new case in that forum. The case before this Court is distinct from the one filed in Wisconsin, and the law-of-the case doctrine does not apply. *See Sharp Electronics Corp. v. Metropolitan Life Ins. Co.*, 578 F.3d 505, 510 (7th Cir. 2009); *Waid v. Merrill Area Public Schools*, 130 F.3d 1268, 1272 (7th Cir. 1997). However, the Second Amended Complaint fails to allege new facts warranting this Court's exercise of personal jurisdiction over the Milwaukee defendants.

Plaintiff argues that the defendants involved in Dr. Khorrami's seizure and detention are subject to jurisdiction in Illinois under the effects test, as articulated in *Calder v. Jones*, 465 U.S. 783 (1984). According to Plaintiff, the Milwaukee defendants "committed tortious acts aimed at an Illinois resident with the knowledge that their conduct would result in injury in Illinois." FBI Agents Doyle, Mueller and Felske, as well as INS Agents Neinhardt and Marten, participated in the investigation, seizure and detention pursuant to coordination and consultation between Chicago and Milwaukee FBI offices. In addition, the Milwaukee defendants directed their activities toward the state of Illinois by seizing, detaining and shipping Dr. Khorrami back to Illinois with the knowledge and intent that he would be detained in Illinois. Dr. Khorrami maintains that:

25

Milwaukee FBI Agents Felske and Mueller, in consultation with INS Agents Neinhardt and Marten, interrogated Dr. Khorrami and then directed that he be taken into custody by the INS. Agents Neinhardt and Marten, who had participated in communications with the Chicago FBI, took Dr. Khorrami into INS custody, held him in Wisconsin while the FBI interrogated him, then sent Dr. Khorrami to Broadview, Illinois for his continued detention. These Defendants repeated tortious acts toward an Illinois resident resulting in Dr. Khorrami's prolonged detention in Illinois satisfy the effects test and subject those individuals to jurisdiction in Illinois.

This Court may exercise jurisdiction over any individual that has such minimum contacts with Illinois such that maintenance of the suit would not offend traditional notions of fair play and justice. *See RAR, Inc. v. Turner Diesel*, 107 F.3d 1272, 1277 (7th Cir. 1997). The Illinois long-arm statute authorizes jurisdiction over any individual that commits a tortious act in Illinois. 735 ILL. COMP. STAT. 5/2-209(a)(2). The Illinois Constitution and the reach of the long-arm statute are co-extensive with the scope of the Federal Constitution. *See Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 715-16 (7th Cir. 2002). As the Supreme Court held in *Calder v. Jones*, where the "effects" of a defendant's tortious acts cause injury in the forum and the defendant has expressly aimed his tortious activity into the forum, subjecting the defendant to personal jurisdiction satisfies the requirements of due process. 465 U.S. at 789-90 (1984) (holding that California court could exercise personal jurisdiction over Florida defendants based on the effects of their Florida conduct in California on California plaintiff).

Defendants maintain that the allegedly tortious action cannot be considered to be "expressly aimed" at an Illinois resident. Although it might have been foreseeable that an injury could be felt in Illinois, such foreseeability cannot serve as the basis for personal jurisdiction. *Calder*, 465 U.S. at 789. In *Calder*, the Court held that where defendants "are primary participants in an alleged wrongdoing intentionally directed at a California resident, [ ]

jurisdiction over them [by a California court] is proper on that basis." *Id.* at 790. But there, the plaintiff was injured *in California* by the defendants' conduct *in California*.

In this case, the pre-arrest interrogation occurred in Wisconsin, and its effects were felt there. To the extent that Dr. Khorrami is alleging the prolonged detention in Illinois to be the tort, this Court held that it is barred by § 1252(g) from considering a Fourth Amendment claim based on Dr. Khorrami's detention. All of the substantive due process violations were also committed in Wisconsin, and they cannot serve as the basis for this Court's exercise of jurisdiction over the Milwaukee defendants. Plaintiff's amended pleading fails to cure the jurisdictional deficiencies of the prior pleading, and he provides no basis for this court to exercise jurisdiction over the Milwaukee defendants.

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is denied as to Plaintiff's procedural due process claim against Defendant Rolince, and granted as to Plaintiff's remaining substantive due process and Fourth Amendment claims.

ENTER:

James B. Zagel
James B. Zagel
United States District Judge

DATE: March 26, 2010

27