# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| AHMAD FARID KHORRAMI, <br><br> Plaintiff, <br><br> v. <br><br> MICHAEL E. ROLINCE, <br><br> Defendant. | No. 03 C 6579 <br> Judge James B. Zagel |

## MEMORANDUM OPINION AND ORDER

In this action, Plaintiff Ahmad Farid Khorrami brings a *Bivens* claim against Defendant Michael E. Rolince alleging Fifth Amendment violations. This case is currently before me on Defendant's motion for summary judgment. For the following reasons, I am granting Defendant's motion and dismissing this case in its entirety.

## FACTS

Ahmad Farid Khorrami is an Iranian-born British citizen. He came to the U.S. in 1997 on a temporary vocational visa, but his visa expired in 2000. Two months after Khorrami's visa expired, his wife filed an I-130 petition for an alien adult relative visa and then Khorrami filed an I-485 for adjustment of status, requesting legal permanent residence as the spouse of a U.S. citizen. In February 2001, Khorrami was issued advanced parole that allowed him to visit Canada and be paroled back into the country. During this time, Khorrami was working at Skyway Airlines in Milwaukee and lived in Chicago with his wife.

Michael Rolince was the Section Chief of the Federal Bureau of Investigation's International Terrorism Operations Section in the Counterterrorism Division during the September 11 investigations. He had oversight responsibility for international terrorism

1

investigations conducted by the 96 domestic and international FBI offices. In this capacity, Rolince signed the disputed declaration (the "Rolince Declaration") which is a central component of this case. Both parties agree that the Rolince Declaration contained inaccurate information about Khorrami, and was thus a false declaration.

      The Rolince Declaration was part of the Department of Justice's "Hold Until Cleared" policy. The DOJ enacted this policy after September 11 to monitor persons of interest. The FBI effectuated this policy through FBI attorneys, the Immigration and Naturalization Service, and several sections within the DOJ. The FBI monitored the status of INS detainees' immigration proceedings, ensured INS field attorneys responsible for the detainees' immigration proceedings had sufficient information about the FBI's existing investigative interest, and provided legal advice to those carrying out the Hold Until Cleared policy.

      In Khorrami's case, FBI attorneys brought the Rolince Declaration to Rolince for review and signature on November 9, 2001. Rolince did not review the declaration for accuracy, but relied on the field offices and FBI attorneys for verification. According to Rolince, he assumed the declaration's execution was lawful due to the number of attorneys involved and the fact that an attorney presented it to him. This was standard procedure under the Hold Until Cleared policy. Specifically, the Rolince Declaration was based on a Milwaukee field office report by FBI Milwaukee Supervisory Special Agent Katherine Schweit. Agent Schweit did not independently verify the information, but similarly relied on other FBI personnel to ensure the information was accurate. FBI attorney Keith Eirinberg discussed the report with Agent Schweit, and then used it to prepare the Rolince Declaration. After Rolince signed it, the Rolince Declaration was sent to the INS field attorneys handling Khorrami's removal proceedings. Rolince, Agent Schweit, Eirinberg, and all other FBI attorneys had access to FBI's Automated

Case System which could have been checked to verify information on Khorrami.

Shortly after the September 11 attacks, Khorrami learned that the FBI was investigating him and inquiring about him to his friends. Khorrami contacted the FBI and voluntarily submitted to an interview in Chicago to address these concerns. The FBI originally identified Khorrami as a person of interest because it believed he instructed at the same flight training school as certain September 11 hijackers and resided at the same apartment building as hijacker Waleed Mohammed Al-Sheri. The FBI also investigated Khorrami's personal finances because it believed Khorrami initiated suspicious money transfers. In addition to the Chicago interview, INS and Milwaukee FBI agents interviewed Khorrami at his place of work and at the FBI field office in Milwaukee from September 17 to September 18, 2001. The information from these interviews was the basis of Agent Schweit's report and thus used to create the Rolince Declaration signed in November 2001.

On September 18, 2001, the INS served Khorrami with a Notice to Appear and he was subsequently arrested. He was also informed that INS Chicago District Director Brian Perryman revoked his advanced parole. Rolince claims that the INS initiated removal proceedings against Khorrami because he was an arriving person not in possession of valid entry documents in violation of 8 U.S.C. § 1182(a)(7)(A)(i)(I). According to Khorrami, however, he was arrested due to the Rolince Declaration which substantiated the FBI's investigatory interest in him related to the September 11 attacks under the Hold Until Cleared policy.

After his arrest, Khorrami had four hearings before Immigration Judge (IJ) Renetta Smith. All of these proceedings were closed to the public, including Khorrami's wife and a representative of the British Consulate. At the first hearing on October 10, 2001, IJ Smith denied Khorrami's motion for bond, citing a lack of jurisdiction to determine Khorrami's custody

3

because the INS considered Khorrami to be an arriving alien and his removal proceedings were pending. Khorrami then filed a motion to terminate removal proceedings, challenging the INS determination by arguing that he was not an arriving alien.

After Khorrami renewed his motion at the second hearing on October 24, IJ Smith denied his motion and sustained the charge of removability, finding Khorrami was an arriving alien. IJ Smith said that she would allow Khorrami to litigate his I-485 application if the INS finished Khorrami's background check and approved his visa petition. She continued the matter to November 14. If Khorrami successfully litigated his petition, he would become a legal resident and his immigration proceedings would end; it would also have allowed him to secure release on bond that was previously denied by IJ Smith. In addition to seeking release on bond and filing for adjustment of status, Khorrami also sought parole from custody from INS District Director Perryman.

At the next hearing on November 14, INS Chicago Counsel Seth Fitter notified the court that the background check was incomplete and Khorrami's visa was not approved. IJ Smith continued the case to December 12. Fitter stated that he planned to oppose Khorrami's adjustment petition at the next hearing in order to prevent Khorrami's release from custody because he was still of investigative interest. Then, Fitter provided the court and Khorrami with the Rolince Declaration from November 2001 to substantiate the investigative interest.

While Khorrami was detained and his immigration proceedings were underway, the FBI field offices in Chicago and Jacksonville verified Khorrami's residence, flight school, and personal finances. The FBI discovered that the Al-Sheri residing at Khorrami's prior residence in Florida was not the September 11 hijacker, but a college student unconnected with the attacks. The FBI also found that Khorrami was not at the same flight school as September 11 hijackers

and had not initiated suspicious financial transactions. Although the Jacksonville FBI sent two electronic communications on September 20, 2001 to Rolince's FBI division explaining the information was false, this information was not read by the appropriate individuals in Chicago to exonerate Khorrami until December 2001. This information was, however, available in the FBI's Automated Case System.

On December 11, the day before Khorrami's hearing where Fitter intended to introduce the Rolince Declaration, a Chicago FBI agent read the exculpatory memos from September and sent another electronic communication to Rolince's division. The Chicago FBI also sent a letter to the immigration court, explaining that the Rolince Declaration was false. The next day, the FBI sent a letter signed by Rolince to INS District Director Perryman, stating that the FBI had no investigative interest in Khorrami and consented to his removal from the INS Custody List. Subsequently, the INS completed Khorrami's background check and approved his visa petition in time for his next immigration hearing before IJ Smith. The same day, IJ Smith confirmed Khorrami's visa approval and stated that she could adjudicate his adjustment petition. She continued the matter until January 9, 2002. Fitter never introduced the Rolince Declaration.

Shortly after, Khorrami was released from custody when INS District Director Perryman reconsidered Khorrami's parole request and granted it for humanitarian reasons. For two years, the INS continued to oppose Khorrami's adjustment application in his removal proceedings. After a full evidentiary hearing, IJ Smith issued a final order on June 24, 2004, finding Khorrami to be removable as charged but granting his adjustment application for permanent resident status based on his marriage to a U.S. citizen.

Although several settlement discussions occurred, the parties were unable to reach an agreement. According to the government, there was no amount of money that could have

convinced Khorrami to settle this case. Based on what happened, this is understandable.

## LEGAL STANDARD

Summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine issue of triable fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Pugh v. City of Attica, Ind.*, 259 F.3d 619, 625 (7th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

Once the moving party has set forth the basis for summary judgment, the burden then shifts to the nonmoving party who must go beyond mere allegations and offer specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). The nonmoving party must offer more than "[c]onclusory allegations, unsupported by specific facts" in order to establish a genuine issue of material fact. *Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)). A party will be successful in opposing summary judgment only if it presents "definite, competent evidence to rebut the motion." *EEOC v. Sears, Roebuck & Co.*, 233 F.3d 432, 437 (7th Cir. 2000).

I consider the record in the light most favorable to the non-moving party, and I draw all reasonable inferences in the non-movant's favor. *Lesch v. Crown Cork & Seal Co.*, 282 F.3d 467, 471 (7th Cir. 2002). I will accept the non-moving party's version of any disputed fact, however, only if it is supported by relevant, admissible evidence. *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996).

## DISCUSSION

Summary judgment is appropriate here because Khorrami does not have a *Bivens* claim and Rolince is entitled to qualified immunity.

**I.     Does Khorrami have a *Bivens* claim?**

In *Bivens v. Six Unknown Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), the Supreme Court recognized an implied cause of action for damages against federal officers to redress a constitutional violation. *Engel v. Buchan*, 710 F.3d 698, 703 (7th Cir. 2013) (citing *Bivens*, 403 U.S. at 389-90). In the forty-five years that followed, the Supreme Court has recognized only two other contexts to extend an implied cause of action under *Bivens* against government employees: an employment discrimination claim in violation of the Fifth Amendment's Due Process clause, *Davis v. Passman*, 442 U.S. 228 (1979), and a claim by a prisoner in violation of the Eighth Amendment, *Carlson v. Green*, 446 U.S. 14 (1980). In 2007, the Court renewed its reluctance to extend a *Bivens* damages action absent "a judgment [that it is] . . . the best way to implement a constitutional guarantee; it is not an automatic entitlement no matter what other means there may be to vindicate a protected interest, and in most instances we have found a *Bivens* remedy unjustified." *Wilkie v. Robbins*, 551 U.S. 537, 550 (2007).

The Seventh Circuit has characterized the *Bivens* trajectory as becoming more "refined and narrowed," expressly rejecting the extension of *Bivens* actions to new contexts. *Engel*, 710 F.3d at 703-04. Accordingly, the Supreme Court has rejected *Bivens* claims for violations of First Amendment rights of federal employees by government employers, *Bush v. Lucas*, 462 U.S. 367, 368 (1983); harms suffered while in military service, *United States v. Stanley*, 483 U.S. 669 (1987); denials of Social Security benefits, *Schweiker v. Chilicky*, 487 U.S. 412, 414 (1988); claims federal officials retaliated against private landowners, *Wilkie*, 551 U.S. 537 (2007); and

Eighth Amendment claims against private contractors administering public prisons, *Minneci v. Pollard*, 132 S. Ct. 617 (2012). In *Minneci*, the Court reiterated its *Wilkie* two-step analysis as governing framework. *Engel*, 710 F.3d at 705 (quoting *Vance v. Rumsfeld*, 701 F.3d 193, 199 (7th Cir. 2012)).

When faced with a possible *Bivens* claim, courts must determine whether the context of the action is new. *See Wilkie*, 551 U.S. at 550; *Arar v. Ashcroft*, 585 F.3d 559, 563 (2d Cir. 2009). If the context is new, *Wilkie*'s two-step analysis counsels whether to extend a *Bivens* action. *Id.* First, courts consider whether a comprehensive, alternative remedial scheme exists. *Engel*, 710 F.3d at 704. Second, courts consider special factors. *Engel*, 710 F.3d at 703. This is a "subject of judgment" federal courts undertake "to represent the best way to implement a constitutional guarantee," *Wilkie*, 551 U.S. at 550, subject to special factors that "counsel[] hesitation before authorizing a new kind of litigation," *Bush*, 462 U.S. at 378.

**A.      Does Khorrami's case present a new context for a *Bivens* claim?**

The first question to consider is whether the case at bar fits precedent or presents a new context for a *Bivens* claim. Khorrami and Rolince suggest competing legal standards, but I find Rolince's statement of the law is correct. However, under either formulation of law, Khorrami's context is new for a *Bivens* claim.

Khorrami argues we should follow precedent from the Second Circuit. In *Arar v. Ashcroft*, context is defined as a potentially recurring scenario that has similar legal and factual components. 585 F.3d at 572. The recurring scenario must be specific because "at a sufficiently high level of generality, any claim can be analogized to some other claim for which a *Bivens* action is afforded," but also not too fact-dependent as "at a sufficiently high level of particularity, every case has points of distinction." 585 F.3d at 572. The Second Circuit refined

8

this definition by looking at the rights injured and the mechanism of the injury. *Turkmen v. Hasty*, 789 F.3d 218, 234-35 (2d Cir. 2015).

Even under his suggested law, Khorrami does not succeed because he takes the approach *Arar* governs against, even when coupled with *Turkmen*'s injury-mechanism approach. Under *Turkmen*, which is not binding precedent but persuasive nonetheless, Khorrami's case is a new context because *Turkmen* recognizes factual circumstances are a necessary part of context. 789 F.3d at 235 (describing with some particularity as a context: "federal detainee Plaintiffs housed in a federal facility, allege that individual federal officers subjected them to punitive conditions."). Khorrami states the context of his case is that his Fifth Amendment due process rights were injured due to false testimony in a hearing. However, Khorrami cannot suggest his context at such a high level of generality because it is explicitly what *Arar* rejects and *Turkmen* refines. *Turkmen* recognized *where* the detainee was housed in the injury-mechanism approach. Therefore, under *Turkmen*, a proper conceptualization of the context at bar would be: a federal detainee alleges a federal official violated his Fifth Amendment due process claim by submitting false testimony during an *immigration removal proceeding*. Khorrami's general statement of "a hearing" is counter to the Supreme Court's desire to limit *Bivens* claims by avoiding a high level of generality.

The result is the same under Rolince's correct recitation of Seventh Circuit law, where the method for determining whether a context is new comes from *Vance*, applying only *Arar*'s reoccurring scenario with similar legal and factual components. 701 F.3d 193, *passim* (7th Cir. 2012). Rolince characterizes this approach as fact-dependent. While there are many variations a party or court could pick to be the context of this case, the fact that Khorrami was in immigration removal proceedings inevitably must be included. Khorrami cannot ignore the *where* of his

9

context. This fact makes the context of the case new.

Under either *Turkmen*'s mechanism-injury formula for determining whether a case presents a new context for a *Biven*'s claim or *Vance*'s fact-dependent method, I find that Khorrami's context considering an alleged violation of Fifth Amendment Due Process during immigration proceedings is new. Thus, I am required to perform *Wilkie*'s two-step analysis to determine if a *Bivens* claim should be extended to Khorrami.

**B.      Is there a comprehensive, alternative remedial scheme for Khorrami's injury?**

In applying *Wilkie*, courts must consider if a comprehensive, alternative remedial scheme exists. *Engel*, 710 F.3d at 704. If such a scheme exists, it may preclude a *Bivens* remedy despite its deficiency and imperfection compared to a possible *Bivens* remedy. *Id.* A scheme can be an alternative, remedial scheme whether or not Congress has declared it to be substitute relief. *Id.* However, the goal of the scheme must be to protect the constitutionally protected interest to a sufficient degree. *Alvarez v. ICE*, 818 F.3d 1194, 1206(11th Cir. 2016); *see Wilkie*, 551 U.S. at 550.

Whether there is such a remedial scheme to address Khorrami's claim is an open question of law with no precedential holding in this circuit. The issue in this case is what constitutes "comprehensive" and if the Immigration Naturalization Act of 1965 sufficiently protects Khorrami's due process rights.

Here, the INA coupled with *habeas corpus* meets this standard of providing adequate alternative remedies for due process rights arising from immigration proceedings. The INA and *habeas* creates sufficient procedural safeguards that prevent violations of due process and provide real-time solutions to violations as they arise. For example, some of the safeguards available to Khorrami in his immigration removal proceedings as outlined in the INA were the

right to be represented by counsel, examine evidence against him, request a subpoena for witnesses or documents, cross-examine witnesses, object to the evidence against him, and present evidence on his own behalf. When the time came to litigate his adjustment status, Khorrami also could have moved to strike the Rolince Declaration as hearsay. After the hearings on his status, Khorrami could then have appealed the use of the Rolince Declaration, as well as petitioned for *habeas corpus*. Against the imperfect standard from *Engel* for alternative, remedial schemes and the safeguards that are in place, I cannot find that on balance there was no scheme in place to protect Khorrami's due process rights.

Khorrami argues that we must ask whether the possible remedial scheme provides sufficient compensation to victims and creates similar incentives for potential defendants to comply with the constitution. *Minneci*, 132 S. Ct. at 625. He argues that he must be restored regarding the extra month he was incarcerated and that this can only be accomplished with monetary damages. Because the INA and *habeas* do not provide retrospective monetary damages nor incentive to defendants to avoid constitutional violations, there is no adequate remedial scheme.

However, there is no suggestion by the Supreme Court's imperfect standard that a remedy must include retroactive remedies such as monetary compensation or that the procedural safeguards of the INA and *habeas* are inadequate deterrents to possible defendants. Recent holdings in other circuits support this view. Courts have held the INA precludes a *Bivens* remedy in alien detention and removal proceedings because the INA broadly governs immigration hearings, including detailing removal proceedings, setting forth procedural safeguards, providing the right of appeal, and providing remedy for wrongful immigration detention, along with the availability of *habeas* claims. *See, e.g.*, *Mirmehdi v. U.S.*, 689 F.3d 975 (9th Cir. 2011) (no

11

*Bivens* claim when FBI agent lied in bond hearing because alternative remedies included INA and *habeas* and Congress didn't create monetary relief); *Alvarez*, 818 F.3d at 1208-09 (no *Bivens* claim because the INA supplies "a host of review procedures" and *habeas* supplies plaintiffs "with the most speedy, direct, and powerful remedy from wrongful detention," whereas monetary compensation would "afford, at best, an incomplete, secondary, and substantially delayed remedy for a detention based on false claims made by a government agent."); *De La Paz v. Coy*, 786 F.3d, 367, 375-8 (5th Cir. 2015) (no *Bivens* claim, finding a "fair reading of legislative developments pertaining to immigration leads ineluctably to the conclusion that Congress's failure to provide an individual damages remedy "has not been inadvertent"). With regard to deterrence to future defendants, it is undisputed by Khorrami that FBI agents are already sufficiently deterred at each step of the INA and *habeas* proceedings from false testimony by adversarial proceedings, the risk of their losing jobs, damage to careers based on credibility, and criminal perjury charges. Given this background of persuasive authority, it is difficult to say that a reasonable jury could find that the INA and *habeas* do not provide an alternative, remedial scheme to protect Khorrami's constitutional rights.

While Khorrami points to my denial of Rolince's motion to dismiss his *Bivens* claim where I held that the INA was not a comprehensive remedial scheme, the persuasive case law of other circuits that pairs the INA with *habeas*, as well as the closer examination of procedural safeguards in place in immigration proceedings beyond the record in 2007, leads me to the opposite conclusion today. Additionally, his argument then and now focuses on *Minneci*. Not only has the Seventh Circuit refined what an alternate, remedial scheme is through *Engel*'s imperfect standard, the rule Khorrami cites from *Minneci* contemplates state tort law satisfying *Wilkie*, not whether a comprehensive federal statutory scheme provided alternative remedies.

12

Thus, I find that the INA coupled with *habeas* is an alternative, remedial scheme to a *Bivens* remedy in this case.

With the imperfect standard in mind, which is sensible given the Supreme Court's reluctance to extend *Bivens* remedies, I cannot find that there is no alternative, remedial scheme to protect Khorrami's rights even construing the evidence in his favor. Immigration removal proceedings have some safeguards in place, by many definitions, substantial safeguards, and *habeas corpus* is always available to those who believe they are wrongly detained. Therefore, I find that the INA coupled with *habeas corpus* is a sufficient comprehensive, remedial scheme under *Engel*'s imperfect standard.

**C.** **Are there special factors counseling hesitation granting a *Bivens* remedy?**

The second and final step of analysis in *Wilkie* considers whether there are special factors that counsel hesitation on the part of courts before granting a *Bivens* remedy to a new context. Special factors usually regard issues of a sensitive governmental nature. *Engel*, 710 F.3d at 703. As the Seventh Circuit noted:

> [T]his part of the analysis has tended to focus on concerns about judicial intrusion into the sensitive work of specific classes of federal defendants—military officials in *Stanley* and *Vance*, for example; immigration authorities in *Mirmehdi* . . . and sometimes also concerns about doctrinal unworkability, as in *Wilkie*.

*Engel*, 710 F.3d at 707-08. The *Arar* court found the threshold for special factors counseling hesitation to be "remarkably low." 585 F.3d at 574 (2d Cir.). Indeed, "[h]esitation is a pause, not a full stop, or an abstention; and to counsel is not to require." *Id.* at 575. Specific to immigration proceedings, when the Seventh Circuit found no special factors counseling hesitation in *Engel*, it cited *Mirmehdi* as an example of such factors that touch sensitive government work by federal officers; specifically, that

13

*Miremhdi* dealt with immigration authorities. 710 F.3d at 707. In *Alvarez*, the court found the INA itself counsels in favor of hesitation because it is a broad and detailed statute in which due process is intertwined with procedures and remedies laid out by the INA. 818 F.3d at 1210.

Factors that I find counsel against the extension of a *Bivens* remedy to Khorrami within an immigration removal context include national security, diplomacy, and administrability of the INA.

This case illustrates the national security concerns that an immigration removal context raises, as did *Mirmehdi*, a strikingly similar case to Khorrami's. Rolince was a high-level FBI officer responsible for carrying out critical investigations in the wake of the largest national security crisis in recent history. The Hold Until Cleared policy was no doubt instrumental in verifying that individuals being investigated by the FBI were not a threat to the United States. Khorrami's claim would implicate all September 11 policies and all declarations Rolince has since signed, as well as the investigation process related to September 11. Khorrami essentially asks a trier of fact to second-guess DOJ and FBI judgments at the time of how to best manage and structure its resources in response to the worst terrorist attack in US history—directly implicating immigration concerns. Thus, it is clear that an immigration removal context has special factors that counsel at least a brief pause of hesitation before extending a *Bivens* claim.

Additionally, as in *Alvarez*, Khorrami's claim would certainly make administering the INA more difficult and this in itself could affect diplomacy, national security, as well as implicate separation of powers between the judiciary, Congress, and executive agencies. As described above, the immigration removal proceedings are highly relevant to national security and diplomacy; therefore, any barriers in administrability could implicate those concerns. In

terms of separation of powers, granting Khorrami a *Bivens* claim would force a court to determine the contours of an inadmissible alien's due process rights in connection with the INA District Director's absolute discretion to grant parole, as well as the FBI's discretion to design and execute its policies. I cannot determine that there is no administrability and separation of powers concerns that would not counsel even a "brief pause" by the judiciary before extending a *Bivens* remedy.

## II.     Qualified Immunity

In the Seventh Circuit, a federal officer is not entitled to qualified immunity on a summary judgment motion if (1) the facts, in the light most favorable to the non-moving party, establish a constitutional violation by a government official and (2) the right is clearly established such that a reasonable person would have known he was violating a constitutional right. *See Betker v. Gomez*, 692 F.3d 854, 860 (7th Cir. 2012); *Jones v. Clark,* 630 F.3d 677, 680 (7th Cir. 2011). This standard requires either intentional wrongdoing or recklessness, or more than negligence or even gross negligence. *See Archie v. City of Racine*, 847 F.2d 1211, 1219-20 (7th Cir. 1988) (holding gross negligence does not violate due process but recklessness would). Recklessness "reflects a complete indifference to risk such that we can infer the actor's knowledge or intent." *Weinberger v. State of Wisconsin*, 105 F.3d 1182, 1186 (7th Cir. 1997) (citing *Clifton v. Schafer*, 969 F.2d 278, 281 (7th Cir.1992)). It is not reckless to rely on a fellow officer as an affiant if in securing a warrant officers permitted to rely on other officers. *See United States v. Ventresca*, 380 U.S. 102, 111 (1965). However, if an officer materially misleads the court, with regard to the source of information, there is no defense of qualified immunity. *Malley v. Briggs*, 4751187 U.S. 335, 344–45 (1986) (holding relying on an affiant is not per se reasonable).

15

Even construing the facts and drawing all inferences in favor of Khorrami, a reasonable jury could not find that Rolince met the standard of intentional wrongdoing or recklessness; Rolince was at most negligent and, therefore, qualified immunity bars Khorrami from bringing a claim against him. There is no evidence that Rolince intended to submit a false affidavit or that he was reckless in signing the Rolince Declaration. Based on the record before the Court, it was reasonable for Rolince to rely on FBI field agents and attorneys. Rolince was effectively the managing director of nearly a hundred FBI offices during a time of frequent investigations after September 11. It is impossible to infer reckless disregard for the truth simply because Rolince relied on subordinate officers to dutifully complete their duties and follow FBI/DOJ procedures.

Furthermore, given this background of procedures, the many levels of agents involved, and the role of multiple FBI field offices, it is clear that Rolince did not blindly rely on others and that Rolince did not assume the report was likely to have errors. To say that Rolince knew of potential errors such that he could be considered reckless is more than a stretch for a reasonable jury; otherwise, it is impossible to imagine how government officials could complete their work without fear of litigation on a daily basis. If under *Ventresca* it is not reckless to rely on a fellow officer as an affiant in securing a warrant, it is difficult to say Rolince would be reckless in signing a declaration. I find that a jury could not impute intentional wrongdoing or recklessness to Rolince's actions.

Additionally, Khorrami argues that a lack of a source of knowledge in the Rolince Declaration is a nullifying factor for qualified immunity as well. However, it is clear that Rolince did not materially mislead the court with regard to the source of information. Given the factual background of the Hold Until Clear policy and Rolince's high-level management position, a reasonable jury could not find that Rolince intentionally wanted to materially mislead this court

16

by signing the declaration. Otherwise, again, it would be impossible for federal agencies such as the DOJ and FBI to fulfill their missions efficiently and effectively.

Khorrami's claim is therefore barred by qualified immunity because Rolince committed no intentional wrongdoing or recklessness with regard to the information in the Rolince Declaration, and did not intend to materially mislead this court with the attribution of the information in the Rolince Declaration.

## CONCLUSION

For the reasons stated above, I am granting Defendant's motion for summary judgment.

ENTER:

*James B. Zagel*

James B. Zagel
United States District Judge

DATE: July 27, 2016